1  Law Office of Elizabeth Garfinkle,
2  State Bar Number No. 228536
3  P.O. Box 13172
4  Oakland, CA 94661
5  510-501-0542
6  lizgarfinkle@gmail.com

7  Attorney for Defendant, Michael Anthony Leboeuf

8

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR-19-00209 PJH |
|---|---|
| Plaintiff, | **DEFENDANT'S NOTICE AND EMERGENCY MOTION FOR COMPASSIONATE RELEASE, REDACTED** |
| v. | |
| MICHAEL ANTHONY LEBOEUF, | |
| Defendant. | |

## NOTICE

PLEASE TAKE NOTICE that, at a date and time convenient to the Court for a telephonic hearing, Defendant Michael Anthony Leboeuf will and hereby does move the Court for an order for his immediate release from custody. This motion is based on 18 U.S.C. § 3582, the attached memorandum of points and authorities, the concurrently filed declaration of counsel, Elizabeth Garfinkle, and upon such evidence and argument as may be presented at the motion. Due to the urgency of this emergency request, Mr. Leboeuf requests a hearing at the Court's earliest convenience.[1]

---

[1] On July 10, 2020, undersigned counsel communicated by email with Assistant U.S. Attorney, Jonathan Lee, informing him of her appointment to prepare a compassionate release motion and requesting B.O.P. records, which she received

1

**TABLE OF CONTENTS**

NOTICE ..................................................................................................................... 1

TABLE OF CONTENTS ......................................................................................... 2

TABLE OF AUTHORITIES .................................................................................... 3

MEMORANDUM OF POINTS AND AUTHORITIES ......................................... 4

   I. Introduction ..................................................................................................... 4

   II. Jurisdiction ...................................................................................................... 5

   III. Factual Background ....................................................................................... 6

      A. Mr. Leboeuf's Medical Condition Places Him at an Increased Risk of Serious Illness or Death. .............................................................................. 6

      B. Lompoc Has Failed to Effectively Manage the Spread of the Virus and the Safety of Inmates. ................................................................................ 8

      C. The Court's Original Sentence and Mr. Leboeuf's Release Plan. .............. 10

   IV. Legal Standard ............................................................................................. 11

   V. Argument ....................................................................................................... 11

      A. This Court Has the Authority to Grant Mr. Leboeuf's Motion. .................. 11

      B. Extraordinary and Compelling Reasons Warrant a Reduction of Mr. Leboeuf's Sentence. .................................................................................. 12

          1. Mr. Leboeuf's medical condition. ......................................................... 12

          2. The COVID-19 crisis at Lompoc and the BOP's failure to ensure safety. .................................................................................................... 14

      C. The Section 3553(a) Sentencing Factors and Sentencing Commission Policy Statements Weigh in Favor of Release. ......................................... 16

CONCLUSION ....................................................................................................... 19

---

on July 13, 20, and 21, and August 3. On August 4, she sent him a draft of this motion. (Garfinkle Decl. ¶¶2, 7, 16.)

# TABLE OF AUTHORITIES

**Cases**

*Torres v. Milusnic*, 2:20-cv-04450-CBM-PVC, 2020 WL 4197285
 (C.D. Cal. July 14, 2020)................................................................................passim

*United States v. Burton*, 18-CR-00094-JSW-1, 2020 WL 4035067 (N.D. Cal.
 July 17, 2020) ........................................................................................................ 15

*United States v. Kelley*, 16-CR-00038-SI-1, 2020 WL 2850280 (N.D. Cal.
 June 2, 2020) ......................................................................................................... 15

*United States v. Liew*, 11-CR-00573-JSW-1, 2020 WL 3246331 (N.D. Cal.
 June 15, 2020) ......................................................................................................... 7

*United States v. Redd*, 1-97-cr-00006-AJT, 2020 WL 1248493 (E.D. Va.
 Mar. 16, 2020) ................................................................................................. 11, 14

*United States v. Sawicz,* 08-cr-287, 2020 WL 1815851 (E.D.N.Y. Apr. 10,
 2020)...................................................................................................................... 15

*United States v. Schaffer*, 13-cr-00220-MMC-1, 2020 WL 3481562 (N.D.
 Cal. June 24, 2020)............................................................................................7, 15

*United States v. Scholler*, 17-CR-00181-SI-1, 2020 WL 2512416 (N.D.Cal.
 May 15, 2020) ........................................................................................................ 7

*United States v. Trent,* 16-cr-178 2020 WL 1812214 (N.D. Cal. Apr. 9, 2020) 15

*United States v. Zukerman,* 1:16-cr-194-AT, 2020 WL 1659880 (S.D.N.Y.
 Apr. 3, 2020).......................................................................................................... 16

**Statutes**

18 U.S.C. § 2252..................................................................................................4, 10

18 U.S.C. § 3582..........................................................................................passim

18 U.S.C. § 3553 ............................................................................... 11, 16, 18

**Regulations**

U.S.S.G. § 1B1.13..................................................................................................4, 12

| | |
|---|---|
| 1 | **MEMORANDUM OF POINTS AND AUTHORITIES** |
| 2 | **I.   INTRODUCTION** |
| 3 | Michael Anthony Leboeuf respectfully moves this Court pursuant to the |
| 4 | First Step Act (FSA) for an order granting compassionate release and resentencing |
| 5 | him to time served or releasing him on an electronic monitor and the equivalent of |
| 6 | home detention. This Court may grant compassionate release if "extraordinary and |
| 7 | compelling reasons" warrant the reduction in the term of imprisonment. 18 U.S.C. |
| 8 | § 3582(c)(1)(A)(i).[2] The Sentencing Commission's relevant policy statement |
| 9 | provides that "extraordinary and compelling reasons" exist when a defendant is |
| 10 | "suffering from a serious physical or medical condition" that "substantially |
| 11 | diminishes the ability of the defendant to provide self-care within the environment |
| 12 | of a correctional facility and from which he or she is not expected to recover." |
| 13 | U.S.S.G. § 1B1.13, cmt. n.1(A). |
| 14 | Such extraordinary and compelling reasons are present here. Mr. Leboeuf is |
| 15 | a 39-year-old federal inmate who is xxx xxxxxxxx, which places him at elevated |
| 16 | risk of severe illness or death from COVID-19. Since the Coronavirus Pandemic |
| 17 | began, he has been incarcerated at either FCI (low-security) or USP (medium- |
| 18 | security) Lompoc, which are now under a court order to expedite review of |
| 19 | compassionate release for at-risk inmates like Mr. Leboeuf, due to the severity of |
| 20 | the outbreak there. Mr. Leboeuf's health has already suffered at Lompoc, |
| 21 | including infection with COVID-19 and the interruption of his xxx medications |
| 22 | and xxxxxxxxx for several weeks. Mr. Leboeuf's coronavirus infection |
| 23 | strengthens his case for release, because it is not yet known whether every |
| 24 | individual who has tested positive develops antibodies and whether those |

---

[2] Further section references are to 18 U.S.C., unless otherwise indicated.

antibodies can prevent reinfection or reactivation, or to what extent his symptoms will exacerbate or create ongoing health problems, and the medical care he has received at Lompoc has been woefully inadequate.

Mr. Leboeuf had no criminal record prior to his pleading guilty to possessing sexual images of teenagers. § 2252(a)(2)&(4). He has an extremely supportive community of family and friends and access to first-rate medical and sex-offender treatment at his home with his husband in San Francisco, and alternatively with his mother in Martinez, where he successfully served pre-trial home detention.

In light of his vulnerability to severe illness or death at Lompoc, Mr. Leboeuf respectfully moves the Court for compassionate release pursuant to section 3582.

## II.   JURISDICTION

In, 2018, Congress amended section 3582 to provide the sentencing judge jurisdiction to consider a defense motion for reduction of sentence based on extraordinary and compelling reasons, "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" § 3582(c)(1)(A).

Mr. Leboeuf has exhausted his administrative remedies with the BOP. He submitted an administrative request for compassionate release to the Lompoc warden in early April or late March, when he first heard about the possibility. The warden denied the request in writing on April 12, 2020. Mr. Leboeuf appealed that denial on May 12. On June 16, he received a response indicating the BOP was reviewing and considering his asserted "extraordinary and compelling reasons,"

and he would be receiving a separate memorandum with a decision. Mr. Leboeuf has not received such a memorandum, though he understands he is now being considered for release pursuant to the TRO in *Torres v. Milusnic*, 2:20-cv-04450-CBM-PVC, 2020 WL 4197285 (C.D. Cal. July 14, 2020). (Garfinkle Decl. ¶ 10, Exh. C, BOP Correspondence.)

Therefore, as a matter of law, Mr. Leboeuf exhausted his administrative remedies at least as of early May 2020, i.e., "30 days after the receipt of [his] request by the warden of the defendant's facility." § 3582(c)(1)(A). The warden's denial of his request on April 16, followed by the failure to provide a timely determination of his appeal on May 12, should be considered final exhaustion that vests this Court with jurisdiction. *Id.*

### III. FACTUAL BACKGROUND

#### A. Mr. Leboeuf's Medical Condition Places Him at an Increased Risk of Serious Illness or Death.

Mr. Leboeuf is a 39-year-old federal inmate at Lompoc, who is xxx-xxxxxxx. (Garfinkle Decl., Exh. A at 15.) He requires consistent medication to manage his xxx and xxxxxxxx, but such medications have been interrupted for weeks at a time since the Pandemic began, and he has not received his necessary labwork to monitor his organ function. (Garfinkle Decl., ¶ 4, Exh. A at 2-4, 13-17, 21.) In late April, 2020, Mr. Leboeuf began experiencing debilitating symptoms of COVID-19, including a high fever, night sweats, and hallucinations for four nights, followed by memory loss and weeks of severe fatigue. (Garfinkle Decl., ¶ 6, Exh. A at 8-9.) His COVID-19 infection was confirmed in his BOP medical records on May 6, 2020. (Garfinkle Decl., ¶ 6, Exh. A 11, 18.) Mr. Leboeuf was informed he would be sent to the "hole" if he reported symptoms. (Garfinkle Decl., ¶ 6.)

1    XXX is recognized by the CDC as an underlying condition which might present an increased risk of severe illness from COVID-19, particularly where people are not on effective xxxx treatment medications (xxxxxxxx therapy).[3] Mr. Leboeuf continues to experience symptoms off and on from his infection; and even if he were to appear to have recovered, there is "no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection."[4] "Many human infections with other viral pathogens, such as influenza virus, do not produce a durable immune response," and it remains "uncertain" what kind of immunity, if any, results from COVID-19 infection.[5] *See United States v. Schaffer*, 13-cr-00220-MMC-1, 2020 WL 3481562 (N.D. Cal. June 24, 2020) (granting motion of prisoner who had recovered from prior COVID-19 infection in light of uncertainty about the possibility of reinfection); *United States v. Liew*, 11-CR-00573-JSW-1, 2020 WL 3246331, *3 (N.D. Cal. June 15, 2020) (same); *United States v. Scholler*, 17-CR-00181-SI-1, 2020 WL 2512416, *5 (N.D. Cal. May 15, 2020) (same).

---

[3] CDC, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html; CDC, *What to Know About xxxx and COVID-19,* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/hiv.html.

[4] World Health Organization, '*Immunity Passports' in the Context of COVID-19*, (April 24, 2020), https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19.

[5] Robert D. Kirkcaldy, et al., *COVID-19 and Postinfection Immunity: Limited Evidence, Many Remaining Questions*, 323 J. Am. Med. Ass'n 2245, 2245 (2020), https://jamanetwork.com/journals/jama/fullarticle/2766097.

**B. Lompoc Has Failed to Effectively Manage the Spread of the Virus and the Safety of Inmates.**

Lompoc's BOP facilities have been hit especially hard by the COVID-19 pandemic. On March 26, 2020, the first person in the city of Lompoc tested positive for coronavirus.[6] By April 3, 23 inmates and 5 staff members at USP Lompoc tested positive for COVID-19.[7] One week later, 45 inmates and 14 staff were infected.[8] The number continued to climb and on April 15, 2020, Senators Kamala Harris and Diane Feinstein, along with Congressman Salud Carbajal wrote to BOP Director Michael Carvajal that Lompoc had 352 inmates and 189 staff who tested positive for COVID-19—the highest infection rate throughout the BOP system nationwide.[9] Nineteen inmates had been hospitalized and six were on ventilators.[10] On May 11, 2020, there were 912 reported cases.[11] As of July 7, 2020, 859 inmates at FCI Lompoc and 170 inmates at USP Lompoc have tested

---

[6] Willis Jacobson, *Lompoc patient tests positive for COVID-19; first confirmed case in city*, Lompoc Record, March 26, 2020, https://lompocrecord.com/news/local/lompoc-patient-tests-positive-for-covid-19-first-confirmed-case-in-city/article_2c850540-0735-5616-b615-c674e4c146ea.html.

[7] Tyler Hayden, *Update: 23 inmates, 5 Staff at Lompoc Prison Test Positive for COVID-19*, Santa Barbara Independent, April 8, 2020, https://www.independent.com/2020/04/03/14-inmates-2-staff-at-lompoc-prison-test-positive-for-covid-19/.

[8] Tyler Hayden, *Covid-19 Continues to Fester and Grow Inside Lompoc Prison*, Santa Barbara Independent, April 10, 2020, https://www.independent.com/2020/04/10/covid-19-continues-to-fester-and-grow-inside-lompoc-prison/.

[9] *Letter from Congressman Carbajal, Senator Harris, and Senator Feinstein to BOP Prison Director Carvajal*, April 15, 2020, https://carbajal.house.gov/news/documentsingle.aspx?DocumentID=649.

[10] *Id.*

[11] Delaney Smith, *Santa Barbara County Urges State to Exclude Lompoc Prison Cases from Reopening Criteria, Santa Barbara Independent*, May 11, 2020, https://www.independent.com/2020/05/11/santa-barbara-county-urges-state-to-exclude-lompoc-prison-cases-from-reopening-criteria/.

positive for COVID-19 or have been deemed "recovered." *Torres*, 2020 WL 4197285 at *3. Four inmates at Lompoc have died from COVID-19. *Id.* The designated capacity for Lompoc is 2,058, but as of June 3, 2020, it was overcrowded with 2,599 inmates. *Id.*

This outbreak and reports of mismanagement and unconscionable conditions at Lompoc led to a class action filed on behalf of inmates by the ACLU Foundation of Southern California and others. *Torres*, 2020 WL 4197285. Declarations filed by inmates show that Lompoc failed to protect inmates and staff. One petitioner who had asthma reported symptoms consistent with COVID-19, yet was ignored for days until he went into respiratory shock and had to be put on a ventilator. *Id.* at12. Another petitioner, after testing positive for COVID-19, was placed in the Special Housing Unit (SHU) for several days and then transferred to an old and unsanitary housing unit, without medicine, soap, or showers. *Id.* A third petitioner, who tested negative for COVID-19 and is low-security, was moved to a makeshift cell block at USP Lompoc subject to near-total lockdown, without the ability to shower or change into clean clothes. *Id.* Mr. Leboeuf has had similarly-unconscionable experiences at Lompoc, including lockdown within close living quarters in the dormitory with no fresh air, temporary closures of the commissary and laundry, making him unable to wash his sweat-ridden clothes and sheets, and failures to consistently provide his necessary medications and lab-work. (Garfinkle Decl. ¶¶ 3, 4, 5.)

The Central District of California recently found that Lompoc inmates have demonstrated their conditions are inconsistent with contemporary standards of human decency. *Torres*, 2020 WL 4197285 at *9. It further found Lompoc officials had "ignored… the known urgency to consider inmates for home

confinement, particularly those most vulnerable to severe illness or death if they contract COVID-19, in failing to make prompt and meaningful use of home confinement" and compassionate release. *Id.* at *16. Finding a risk of irreparable harm to the petitioners' health and that the public interest would be served, the court instituted a temporary restraining order requiring Lompoc to make a prompt determination of the eligibility of home confinement and compassionate release for inmates who are at higher risk for severe illness or death from COVID-19. *Id.* at *18, 23.

From Lompoc's failure to curb the spread of the virus by not providing protective equipment, instituting sound distancing policies, or ensuring safe conditions, along with its failure to provide Mr. Leboeuf's necessary xxx medications, it is evident that so long as Mr. Leboeuf remains in custody there, his health is in jeopardy. As of the filing of this motion, it is not known whether Mr. Leboeuf will be approved for release, pursuant to the Central District's TRO, and thus he is simultaneously exercising his right to have his request for compassionate release or home confinement reviewed by this Court.

**C. The Court's Original Sentence and Mr. Leboeuf's Release Plan.**

A judgment was entered by this Court on December 4, 2019, reflecting Mr. Leboeuf's guilty plea to two counts of receiving visual depictions of minors engaged in sexually explicit conduct in 2013, pursuant to section 2252(a)(2), and one count of possession of child pornography in 2018, pursuant to section 2252(a)(4)(b). (Dkt. 30 at 1.) He was sentenced to 97 months of federal custody, followed by 10 years of supervised release. (Dkt. 30 at 2-3.) His currently-projected release date is August 25, 2026. (Garfinkle Decl., ¶ 15.) Mr. Leboeuf has no prior criminal record.

## IV. LEGAL STANDARD

This Court has the authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." § 3582(c)(1)(A)(i). The compassionate release statute provides, in relevant part:

> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
> (i) extraordinary and compelling reasons warrant such a reduction;
> …
> ¶
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

§ 3582(c)(1)(A). Thus, the statutory requirements for sentence reduction are that the court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors from section 3553(a), and (3) ensure that reduction is consistent with applicable policy statements.

## V. ARGUMENT

### A. This Court Has the Authority to Grant Mr. Leboeuf's Motion.

Before 2018, prisoners could not bring motions for compassionate release on their own; this remedy was only available upon motion of the Director of the Bureau of Prisons. The First Step Act of 2018 "eliminated the BOP director's role

as the *exclusive* channel through which a sentence reduction could be considered by courts." *United States v. Redd*, 1-97-cr-00006-AJT, 2020 WL 1248493, *7 (E.D. Va. Mar. 16, 2020). The compassionate-release statute now allows prisoners to apply directly to the district court for a reduction of their sentence, so long as the prisoner first requests that the Bureau of Prisons bring a motion on his behalf and then either "exhaust[s] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion" or waits "30 days from the receipt of such a request by the warden…whichever is earlier[.]" § 3582(c)(1)(A)(i).

Mr. Leboeuf exhausted his administrative rights by filing a request for compassionate release to the warden in early April or late March, and then appealing the April 12 denial on May 12. (Garfinkle Decl. ¶ 10, Exh. C.)

### B. Extraordinary and Compelling Reasons Warrant a Reduction of Mr. Leboeuf's Sentence.

Mr. Leboeuf's current situation is "extraordinary and compelling." His xxx status, combined with the dangers posed by COVID-19 infection at Lompoc, qualifies as a "serious physical or medical condition" that "substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). Given the dire circumstances of the COVID-19 Pandemic at Lompoc and its failure to protect Mr. Leboeuf's health, compassionate release or home detention is warranted.

#### 1. Mr. Leboeuf's medical condition.

As discussed in Part III.A., *supra*, Mr. Leboeuf's xxx status places him at high-risk for serious illness or death from COVID-19, particularly in light of Lompoc's failure to consistently provide the necessary medications and lab-work during the Pandemic. He has already experienced debilitating symptoms from his

COVID-19 infection, and it is unclear when he will fully recover from those symptoms, how they will interact with his xxx, or whether he will suffer more serious consequences from repeated exposure to the virus at Lompoc.

The long-term repercussions of the virus and how the human immune system responds to the infection is uncertain, with reports of recovered patients testing positive again.[12]  Researchers have found that in battling COVID-19, some individuals' immune systems go into hyperdrive, leading to a release of substances called cytokines that, in excess, can result in damage to multiple organs, including the lungs, kidneys and heart.[13] In addition, immunity levels among those who have tested positive for COVID-19 vary and, even if they have antibodies, it is not clear those antibodies assure future immunity.[14] "So far, scientists don't have firm answers to any of these questions": "whether everyone who has contracted SARS-CoV-2 actually develops antibodies, whether those antibodies protect against secondary infections, and if so, how long the antibodies hang around in the body."[15] The World Health Organization has also cautioned, "there is currently no

---

[12] Marc Lipsitch, *Who is Immune to Coronavirus?* N.Y. Times, Apr. 13, 2020, https://www.nytimes.com/2020/04/13/opinion/coronavirus-immunity.html.

[13] Lenny Bernstein et al., *Coronavirus destroys lungs. But doctors are finding its damage in kidneys, hearts and elsewhere,* Wash. Post, Apr. 15, 2020, https://wapo.st/3f5Jb1L.

[14] Lipsitch, supra note 22; see also Andrew Joseph, *Everything we know about coronavirus immunity and antibodies — and plenty we still don't*, Stat, Apr. 20, 2020, https://www.statnews.com/2020/04/20/everything-we-know-about-coronavirus-immunity-and-antibodies-and-plenty-we-still-dont/.

[15] Katarina Zimmer, *What Do Antibody Tests For SARS-CoV-2 Tell Us About Immunity?* The Scientist, Apr. 15, 2020, https://www.the-scientist.com/news-opinion/what-do-antibody-tests-for-sars-cov-2-tell-us-about-immunity--67425.

evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection."[16]

### 2. The COVID-19 crisis at Lompoc and the BOP's failure to ensure safety.

As described in Part III.B., above., Lompoc's COVID-19 infections have presented an overwhelming health crisis. This constitutes an extraordinary and compelling circumstance that further warrants compassionate release for Mr. Leboeuf. Lompoc's reaction to the pandemic, in failing to enact proper safety measures, implement social distancing, or consistently provide protective equipment or Mr. Leboeuf's xxxxxxxx and xxxxxxxxxxxx medications, demonstrates that the BOP is unable to protect him.

These and additional institutional failures led the Central District of California to order Lompoc to immediately consider all high-risk inmates, including Mr. Leboeuf, for compassionate release. *Torres*, 2020 WL 4197285 at *23. Though Mr. Leboeuf was alerted that he would be considered, he has not heard anything further (Garfinkle Decl. ¶ 10); and indeed, Lompoc officials have received an extension of time to August 19, 2020, to identify inmates they have approved for compassionate release.[17] Given the BOP's past reluctance to process and approve *any* inmates for compassionate release and its slow start to the order, the TRO does not appear to be Mr. Leboeuf's most-efficient or reliable method for obtaining the medical care and protections he requires.[18]

---

[16] WHO, *"Immunity Passports" in the context of COVID*-19, fn.4, *supra*.

[17] *Torres*, 2:20-cv-04450-CBM-PVC, Dkt. 60.

[18] A canvas of all federal and community public defender offices nationwide found not "a single BOP-initiated motion for compassionate release (that was not already finalized pre-COVID) has been made during the current crisis." Brief of Amici Curiae Ninth Circuit Federal and Community Defender Organizations in Support

14

The FSA allows defendants to file compassionate-release motions directly with the court, in light of the "documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants." *Redd*, 1:97-CR-00006-AJT, at *7 (E.D. Va. Mar. 16, 2020). Accordingly, "while the First Step Act did preserve the BOP's role relative to a sentence reduction in certain limited respects, it eliminated the BOP Director's role as the *exclusive* channel through which a sentence reduction could be considered by courts." *Id*. Further, the FSA's amendment to § 3582(c)(1)(A) reflects the congressional aim to diminish the BOP's control over compassionate release by permitting defendants to file sentence reduction motions directly with the sentencing court. Thus, neither the current TRO nor the warden's decision to deny Mr. Leboeuf's compassionate release request (or timely process his appeal) should be given any great weight to this Court's consideration of this motion.

Under these unprecedented circumstances, there are "extraordinary and compelling reasons" to order Mr. Leboeuf's immediate release. Numerous decisions of this District have similarly held. *See, e.g.*, *United States v. Burton*, 18-CR-00094-JSW-1, 2020 WL 4035067 (N.D. Cal. July 17, 2020) (reconsidering and granting compassionate release to FCI Seagoville inmate when conditions at FCI Seagoville are not sufficient to provide care for inmate); *United States v. Kelley*, 16-CR-00038-SI-1, 2020 WL 2850280 (N.D. Cal. June 2, 2020) (granting compassionate release to Terminal Island inmate with cancer, who had been convicted of sex offense and served approximately half of his sentence); *Schaffer*, 13-cr-00220-MMC-1 (granting compassionate-release motion of prisoner who had

---

of Defendant-Appellant, *United States v. Millage*, 20-30086 (9th Cir. April 21, 2020), Dkt. 9.

recovered from prior COVID-19 infection in light of uncertainty about the possibility of reinfection); *United States v. Trent,* 16-cr-178 2020 WL 1812214 (N.D. Cal. Apr. 9, 2020) (granting compassionate release for inmate with HIV); *see also United States v. Sawicz,* 08-cr-287, 2020 WL 1815851, *2 (E.D.N.Y. Apr. 10, 2020) (releasing child-pornography offender based on "[t]he COVID-19 outbreak at FCI Danbury, combined with the fact that the defendant is at risk of suffering severe complications if he were to contract COVID-19 because of his hypertension"); *United States v. Zukerman,* 1:16-cr-194-AT, 2020 WL 1659880, *6 (S.D.N.Y. Apr. 3, 2020) ("[t]he severity of Zukerman's conduct remains unchanged. What has changed, however, is the environment where Zukerman is serving his sentence. When the Court sentenced Zukerman, the Court did not intend for that sentence to 'include a great and unforeseen risk of severe illness or death' brought on by a global pandemic.")

### C. The Section 3553(a) Sentencing Factors and Sentencing Commission Policy Statements Weigh in Favor of Release.

Section 3582(c)(1)(A) directs the Court to consider applicable Sentencing Commission policy statements as well as the sentencing factors under section 3553(a) in determining whether to exercise its authority to reduce a term of imprisonment. Specifically, the Court must "impose a sentence sufficient, but not greater than necessary, to comply with" the following purposes:

>  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>  (B) to afford adequate deterrence to criminal conduct;
>  (C) to protect the public from further crimes of the defendant; and
>  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

1 § 3553(a). These factors support Mr. Leboeuf's release to home detention or
2 supervision.
3       First, though Mr. Leboeuf's offenses are serious, the conduct supporting
4 each count was remote in time. The two counts arising under section 2252(a)(2)
5 occurred in early 2013, and though Mr. Leboeuf still possessed the material
6 forming the basis for the 2252(a)(4) count in 2018, it was on the same old laptop
7 in his closet that contained the material he received in 2013. (*See* Plea Agreement,
8 Dkt. 21 at 3-5; Defendant's Sentencing Memo, Dkt. 27 at 2.) Moreover, Mr.
9 Leboeuf had *no* criminal history besides the instant offenses.
10       Second, Mr. Leboeuf's incarceration at Lompoc is not necessary to deter
11 future criminal conduct or protect the public. He had participated in sex-offender
12 and substance-abuse therapy at the Hope Center in San Francisco pretrial and was
13 making progress there; however, Lompoc has not provided equivalent services and
14 has failed to consistently provide prescribed xxxxxxxxx during the Pandemic. If
15 released on home detention with his husband in San Francisco, any risk to the
16 public which Mr. Leboeuf may have presented pre-arrest would be drastically
17 reduced by his continued participation in therapy at the Hope Center, and his
18 remarkable support system of family and friends who are now alerted to his
19 offenses and have pledged their guidance and support to prevent future offending.
20 (Garfinkle Decl. ¶ 12; Letters of Support, Exh. A to Sentencing Memo, Dkt. 27-1.)
21 This includes Father Stephen Beal, a retired associate of Grace Cathedral with a
22 degree in correctional administration, who lives in Leboeuf's building. (Garfinkle
23 Decl. ¶¶ 12, 14; Letters of Support, Exh. A to Sentencing Memo, Dkt. 27-1 at 22-
24 24.) U.S. Probation Officer J.D. Woods has evaluated Mr. Leboeuf's home with
25 his husband in San Francisco and his mother's home in Martinez, and deemed

them both appropriate for home detention. (Garfinkle Decl. ¶ 11.) Mr. Leboeuf successfully served pretrial home detention at his mother's home. (Garfinkle Decl. ¶ 12.) However, because his mother has several comorbidities, and reaching his medical and therapeutic services in San Francisco from Martinez is significantly-more convoluted and risky during the Pandemic, placement at his home with his husband in San Francisco is the favored plan for home confinement. (Garfinkle Decl. ¶ 13.)

It is true that Mr. Leboeuf does not have an unblemished disciplinary record at Lompoc; however, these non-violent incidents are inextricable from the unconscionable conditions at Lompoc that create compelling and extraordinary reasons for release. For the 297 violation, Mr. Leboeuf was suffering from debilitating xxxxxxxxx in light of the Pandemic and Lompoc's poor management thereof (including its failure to provide his xxxxxxxxxx medications), when he accepted his bunkmate's generous offer to use his allocated minutes to call his husband, not knowing this was against the rules. (Garfinkle Decl. ¶¶ 7 & 8, Exh. B at 1-5.) The 212 violation (refusing bed assignment) occurred when Lompoc moved inmates from J-Dorm to D-House in July, in a mismanaged attempt to improve social-distancing, and Mr. Leboeuf was threatened by Sureños gang members with rape and other physical violence. (Garfinkle Decl. ¶¶ 7 & 9, Exh. B at 6-11.) Mr. Leboeuf accepted the 212 violation and placement in the SHU as the only means of preserving his physical safety. (Garfinkle Decl. ¶¶ 7 & 9, Exh. B at 6-8.) Thus, the presence of these two disciplinary violations should not suggest Mr. Leboeuf presents a danger to the public. If anything, they demonstrate Lompoc's failure to provide reasonably-safe conditions during the Pandemic and present a compelling need for release.

1  Third, it should be abundantly clear that continued incarceration at Lompoc does not fulfill section 3553(a)(2)(D)'s purpose of providing Mr. Leboeuf "with needed … medical care." Such purpose is best served in home detention, where Mr. Leboeuf has access to consistent xxxxxxxx medications from xxx specialists through his husband's health insurance, and dedicated mental-health treatment for his sex-offending, prior substance-abuse, and xxxxxxxx through the Hope Center. His incarceration at Lompoc has gravely-threatened his health by exposing him to COVID-19, while failing to consistently provide his xxx medications, thus exacerbating his risk of serious illness or death, as recognized by the CDC.[19] These conditions present extraordinary and compelling reasons for compassionate release.

## CONCLUSION

For the foregoing reasons, Mr. Leboeuf respectfully asks this Court to grant his request for compassionate release, reduce his sentence to time-served, and order his immediate supervised release. In the alternative, he asks this Court to recommend to BOP that it transfer him to home detention, preferably in San Francisco with his husband, to serve the remainder of his term or, at a minimum, for the duration of the Pandemic.

Dated:  August 5, 2020            Respectfully submitted,

                                  _____/s/_____

                                  ELIZABETH GARFINKLE
                                  Attorney for Defendant/Appellant
                                  Michael Anthony Leboeuf

---

[19] CDC, *Groups at Higher Risk*, n. 3, *supra*.